UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                        Plaintiff,

        v.                                    Case No. 21-cv-933-pp

LT. MICHAEL COLE, *et al.*,

                        Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 25), DENYING PLAINTIFF'S REQUEST TO FILE SUR-REPLY
(DKT. NO. 63-1), DENYING PLAINTIFF'S MOTION TO SUPPLEMENT
RECORD (DKT. NO. 64) AND DISMISSING CASE**

Plaintiff Joshua Howard, who is incarcerated at Fox Lake Correctional Institution and is representing himself, filed this case alleging that the defendants violated his constitutional rights. The court screened the complaint and allowed the plaintiff to proceed on (1) Eighth Amendment claims against defendants Sergeant Drew Weycker, Sergeant Gregory Friedel, Sergeant Kyle Poetter, Captain Jay VanLanen and Lieutenant Andrew Wickman based on allegations that he complained to them about the heat and unsanitary conditions in his cell and they didn't do anything; (2) Eighth Amendment claims against defendants Sergeant Raymond Koeller and Lieutenant Michael Cole for allegedly placing him in the cell;[1] and (3) a retaliation claim against Wickman for allegedly failing to move the plaintiff from the cell in retaliation for

---

[1] The court also allowed the plaintiff to proceed against Doe defendants based on these allegations, but the court subsequently dismissed the Doe defendants because the plaintiff did not identify them. Dkt. No. 39 at 2-3.

1

complaints the plaintiff made against Wickman. Dkt. No. 6 at 9. The plaintiff subsequently moved to dismiss his retaliation claim against Wickman, dkt. no. 19; the court granted the request and dismissed that claim, dkt. no. 20.

This order grants the defendants' motion for summary judgment, dkt. no. 25, denies the plaintiff's request to file a sur-reply, dkt. no. 63-1, denies the plaintiff's motion to supplement the record, dkt. no. 64, and dismisses the case.

## I.    Facts[2]

During the time relevant to this case, the plaintiff was incarcerated at Green Bay Correctional Institution and the defendants worked at Green Bay. Dkt. No. 27 at ¶¶1-8.

### A.    Green Bay's Restrictive Housing Unit

Green Bay's restrictive housing unit (RHU) is a separate area within the institution where incarcerated individuals on disciplinary status and other restrictive status reside. Id. at ¶10. Green Bay has two segregation units: the RHU and the treatment unit. Dkt. No. 57 at ¶1. The RHU is the main unit and has 151 single-occupancy cells. Id. The treatment unit, which is in a separate building, contains twenty-four double-occupancy cells and is used as a transition unit for RHU incarcerated individuals who have exhibited positive behavior. Id. When placing an incarcerated individual on temporary lockup, the

---

[2] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

supervisor has discretion to place the individual in the treatment unit or the RHU. Id. at ¶2.

There is no air conditioning system in the RHU.[3] Dkt. No. 27 at ¶12. Each cell has fresh air coming in through the main ventilation system, which is referred to as "positive air flow." Id. at ¶13. Each cell is supplied with a fresh air vent and an exhaust vent. Id. The institution does not measure or log temperatures in the RHU. Id. at ¶15.

Cells in the RHU are cleaned between each inmate use. Dkt. No. 27 at ¶16. Incarcerated individuals who are hired as janitors clean empty cells using a pressure washer and wet vacuum as needed. Id. at ¶17. Once an individual is placed in a cell, he is responsible for maintaining the cleanliness of the cell. Id. at ¶18. This includes cleaning the floor, walls and other fixtures in the cell. Id. Cell cleaning and sanitizing occurs on Saturdays during second shift. Id. at ¶19. Incarcerated individuals are responsible for cleaning on this day. Id. Staff members assist by distributing and collecting cleaning supplies. Id. An officer applies disinfectant cleaner ("virex" solution) to an unused washcloth and provides this to the incarcerated individual to clean areas of his cell. Id. at ¶20. A broom, dustpan and toilet brushes are available on the designated cleaning day. Id. at ¶21.

---

[3] According to the plaintiff, there is a portable air conditioning unit in the "control room." Dkt. No. 56 at ¶12. During "hot months," staff spent as much time as possible in the control room because it is the only room with air conditioning. Dkt. No. 57 at ¶12.

3

Beyond the designated weekly cleaning day, an incarcerated individual can request cleaning supplies by submitting to a staff member a written request using an "Information Request" form.[4] Dkt. No. 27 at ¶22. Staff members then will assist the individual in cleaning his cell if needed. Id. at ¶23. A power washer also is available for cleaning purposes and an incarcerated individual may request the use of the power washer in his cell. Id. at ¶¶24-25. If the staff member deems the use of the power washer necessary, the individual is removed from the cell and the power washer can be used to clean the walls, floors and/or ceiling of a cell. Id. at ¶26. Staff members or "janitorial inmate staff members" are responsible for using the power washer. Id. at ¶27. The cell walls in RHU are made of concrete, and concrete paint is used to paint the walls. Id. at ¶28. The walls are not porous. Id.

Maries Addison, who worked as a janitor in Green Bay's RHU in July 2018, stated that having to clean up a cell smeared with feces or blood was an almost daily occurrence and that correctional staff left the method for cleaning these cells to the discretion of the janitor cleaning the cell. Dkt. No 57 at ¶12. Addison said that if there were pools of blood he would use washcloths and a mop to sop it up and would otherwise just spray and wipe down the toilet and sink and that staff would not inspect the cell or check his work. Id. at ¶13.

---

[4] According to the plaintiff, this is not listed as an option in the handbook. Dkt. No. 56 at ¶22.

4

B.    Conditions of Plaintiff's Cell

On July 7, 2018, the plaintiff was placed in temporary lockup (TLU) status pending the issuance of a conduct report. Dkt. No. 27 at ¶30. The on-duty RHU sergeant, defendant Koeller, assigned the plaintiff to cell 307. Id. at ¶31. That day, defendant Cole escorted the plaintiff to cell 307 in the RHU. Id. at ¶33. According to institution records, cell 307 had been cleaned the previous day. Id. at ¶34. The plaintiff declined to make a statement upon being placed in RHU. Id. at ¶35. The plaintiff's cell assignment was not predetermined; he was placed in 307 because it was an available cell in a unit that was close to capacity. Id. at ¶37.

The next day—July 8, 2018—Conduct Report No. 3131952 was issued charging the plaintiff with of misuse of medication and disobeying orders, contrary to Wis. Admin. Code ch. DOC §§303.58 and 303.28. Dkt. No. 27 at ¶38. The conduct report states in relevant part that as a non-defendant correctional officer "began to search [the plaintiff's] cell," the officer "came across a ziplock type baggie inside a sock" which contained "16 dark blue pills[,]" which were later identified as bupropion, as well as a tablet of Paroxetine. Id. at ¶39. During the time relevant to his claims, the plaintiff was prescribed medication, including bupropion, a drug used to treat anxiety and depression. Id. at ¶40. On July 11, 2018, the plaintiff accepted an uncontested disposition of sixty days in disciplinary separation in RHU. Id. at ¶41. The plaintiff remained in his assigned cell in RHU—cell 307—until he was moved on July 26, 2018 (a period of twenty days). Id. at ¶42.

5

Cell 307, like all RHU cells at Green Bay, is a "wet cell," which means that it has a toilet and sink with running water. Dkt. No. 27 at ¶46. In the RHU, there are five "hardened cells," including cell 307. Dkt. No. 57 at ¶5. Hardened cells are not equipped with technology such as radio or intercom and have security features added to prevent the destruction of state property. Id.

During the twenty days the plaintiff was housed in cell 307, the average temperature was 83 degrees Fahrenheit and reached nearly 90 degrees on July 9 and July 15. Dkt. No. 57 at ¶14. The plaintiff asserts that "[t]he inmates and staff familiar with Segregation [RHU]" referred to cell 307 as "the hot box," apparently because it "was known to be extremely hot" and was, as a result, used "as a sort of punishment or response to [an inmate's] bad behavior." Dkt. No. 27 at ¶43; Dkt. No. 57 at ¶11. At no time were any of the defendants aware of any conditions or characteristics of the plaintiff's cell which would make it hotter than any other cell in the RHU.[5] Dkt. No. 27 at ¶44. There is no record of any maintenance issue with the ventilation in the RHU in July 2018. Dkt.

_____

[5] The plaintiff testified at his deposition that in addition to having an outside window facing west, the window of cell 307 has a metal gutter wrapped around it which allowed light in but obstructed the occupant's view. Dkt. No. 57 at ¶11. The plaintiff said that this feature reflected direct sunlight into the cell, "vastly increasing the ambient temperature several degrees above the outside recorded temperature." Id. The defendants object to the plaintiff's allegations regarding the temperature in the cell because it is based purely on the plaintiff's own subjective observations, and he has not laid foundation as to how he would know that cell 307 is uniquely hot compared to other cells on the wing. Dkt. No. 61 at ¶11. According to the defendants, the window of cell 307 has a metal piece around it, referred to by maintenance as a detention window privacy shield, as does the cell of every window in RHU. Id. The defendants also state that the cell does not face west; it faces southwest and in the northern hemisphere, in the summer, the sun rises in the northeast and sets in the northwest. Id.

6

No. 27 at ¶45. The plaintiff states that during July 2018, there was no air coming through the vent in his cell. Dkt. No. 56 at ¶13.

After some time in the RHU, "with no property or radio to offer distraction," the plaintiff was "'able to identify several spots on the wall which appeared to contain blood and feces that either was not removed by the swampers [i.e., janitors] or 'had seeped out onto the surface.'" Dkt. No. 27 at ¶47. The plaintiff asked an unidentified staff member for cleaning supplies for his cell "at some point toward the end" of the twenty days he spent in the RHU, meaning during "the final probably seven to 10 days that [he] was there." Id. at ¶48. The plaintiff believed the cleaning supplies that would have been provided on request—a spray bottle and towels—would have been insufficient to clean the walls, because that would have just smeared the filth around. Id. at ¶49.

The plaintiff says he voiced complaints about the conditions of his cell, having "basically the same conversations" "20 or 30 times" with various defendants. Dkt. No. 27 at ¶50. The plaintiff "would stop and ask them why [he] was still in the cell," "complain[] to [them] about the situation, [and] ask[] to be moved." Id. Initially, the plaintiff complained "about just being in the hardened cell because it's typically for people on control status, so it was a little bit harsher than the usual cell" and had no headphone jack. Id. at ¶51. The defendants "just gave [the plaintiff] the same line, which was that there were no other cells available," and "refus[ed] to move [him]." Id. at ¶52.

The plaintiff asserts that he complained to the defendants about the "extreme heat" in his cell and that there was no air movement due to the

7

ventilation not working properly. Dkt. No. 27 at ¶53. The plaintiff states that he complained to the defendants about the cleanliness of his cell, telling them "that it smelled and [that] you could see on the wall the spots on the wall that had been tainted . . . that was within view if you were standing outside," and that the plaintiff "would try and point and said, 'Look, you can see right there on the wall there's a dark spot from it.'" Id. at ¶54. By "tainted," he meant that there "was either a spot where you could see that feces had been spread or what appeared to be blood." Id. The plaintiff did not submit any of these complaints to the defendants on an Interview Request form or other writing. Id. at ¶55.

The plaintiff took psychiatric medication, and he experienced painful withdrawal symptoms when he didn't take it. Dkt. No. 57 at ¶15. The plaintiff's medication was available on the RHU unit on July 7, but it was not offered to him until the evening of July 9, 2018. Id. In addition to going through the physical symptoms of withdrawal the first days in cell 307, the plaintiff states that the heat from the projected sunlight was made worse by the lack of ventilation because there was no air coming out of the vent. Id. The plaintiff spent those first days "physically feeling like he was going to die while simultaneously calmly planning his suicide inside his mind." Id. He also states that "the heat caused the walls to sweat which activated previously dried up

stains of blood and feces which had been smeared into the natural dimpled cavities in the concrete blocks which make up the cell walls." Id.[6]

On July 7, 2018, defendant Koeller worked in the RHU for the first and second shifts. Dkt. No. 57 at ¶16. The plaintiff states that he spoke with Koeller three times throughout the day and each time complained about "the conditions of the cell." Id. Each time, Koeller would tell the plaintiff that the RHU was full and that he would be moved as soon as another cell opened up.[7] Id.

The plaintiff states that on July 8, 2018, he complained to defendant Weycker "about the heat and the conditions of the cell"[8] and asked about his medication. Dkt. No. 57 at ¶18. Weycker said that the RHU was full and that he would check on the medication. Id. The plaintiff states that he complained to Weycker again on July 9, asked to be moved and asked Weycker to see if the vent was turned off because no air was coming out. Id. at ¶19. Weycker said he would check the vent, but the RHU still was full and as he picked up the plaintiff's complaint from the door, Weycker said, "well at least you'll have less distractions to write complaints about." Id. The plaintiff states that he

---

[6] The defendants dispute that there was a lack of ventilation. Dkt. No. 61 at ¶15. There was no record of any maintenance issue with the ventilation in July 2018. Id.

[7] The defendants dispute that the plaintiff spoke to Koeller about the conditions of cell 307. Dkt. No. 61 at ¶16.

[8] The defendants dispute that the plaintiff informed Weycker that the cell was hot and not clean. Dkt. No. 61 at ¶18.
.

9

complained to Weycker about his cell conditions and asked to be moved on July 8, 9, 10, 11, 16, 17, 18, 19, 23, 24 and 25.[9] Id.

The plaintiff states that he first complained to defendant Friedel on July 10, 2018, and that he repeated the issues of "extreme heat, lack of ventilation and the blood and feces on the wall and he received the company line that RHU was full." Dkt. No. 57 at ¶20. The plaintiff states that he complained to Friedel about his cell conditions on July 10, 12, 13, 14, 15, 18, 19, 20, 22 and 23.[10] Id.

On July 11, 2018, defendant Wickman came to the plaintiff's door and offered him sixty days of disciplinary separation and sixty days of building confinement. Dkt. No. 57 at ¶21. The plaintiff complained to Wickman about the heat and how there was no air coming out of the vent and pointed to one of the "stains on the wall" that was visible from outside of the cell door. Id. Wickman said he would look into it and talk to the sergeant, but nothing happened.[11] Id.

The plaintiff states that when he saw defendant Poetter on July 12, 2018, he repeated his complaints "about the heat and conditions of his cell" and

---

[9] The defendants dispute that the plaintiff complained to Weycker about the conditions of his cell. Dkt. No. 61 at ¶19.

[10] The defendants dispute that the plaintiff told defendant Friedel the cell was excessively hot or that it was not clean. Dkt. No. 61 at ¶20.

[11] The defendants dispute that the plaintiff complaint to defendant Wickman about the heat and lack of ventilation and stains on the wall. Dkt. No. 61 at ¶21.

asked to be moved; Poetter replied that the RHU was full and that he would check and make sure the vent was open. Dkt. No. 57 at ¶22. When asked why he didn't move the plaintiff into a "regular cell," Poetter said that he could not recall if there were regular cells available in the RHU in July 2018. Id. The plaintiff states that he complained to Poetter about his cell conditions on July 12, 13, 14, 15, 17, 20, 21 and 22.[12] Id.

The plaintiff states that despite his repeated complaints about the stains on the walls of his cell, none of the defendants or other staff offered him cleaning supplies or offered to have the cell cleaned.[13] Dkt. No. 57 at ¶24. Cleaning supplies are supposed to be offered on a weekly basis, but the plaintiff was in cell 307 for eleven days before this happened. Id. According to the plaintiff, the shift logs show that cleaning supplies were passed out to the 300 wing on July 17 and 24, 2018, while the plaintiff was in cell 307. Id.; Dkt. No. 58 at ¶23. The plaintiff states that the cleaning supplies offered to him to clean the walls of his cell consisted of a washcloth sprayed with disinfectant that was used by the incarcerated individuals in the cells before his and would be used by the cells after his. Dkt. No. 57 at ¶25. The plaintiff also states that while a washcloth would not have been an adequate means of cleaning up feces and bodily fluids, it also would have contaminated all the remaining cells of

---

[12] The defendants dispute that the plaintiff complained to Peotter about the conditions of cell 307. Dkt. No. 61 at ¶22.

[13] The defendants dispute that the plaintiff complained to them about the stains on his walls. Dkt. No. 61 at ¶24.

those who received the same washcloth with a fresh spray of sanitizing fluid.
Id.

For purposes of summary judgment, the defendants do not dispute that they did not offer the plaintiff cleaning supplies. Dkt. No. 61 at ¶24. They state that the plaintiff could have requested the use of a power washer, but it is undisputed that he never did. Id.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

12

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

    B.    <u>Plaintiff's Request to File Sur-Reply and Motion to Supplement Record (Dkt. Nos. 63-1, 64)</u>

Before addressing the merits of the motion for summary judgment, the court addresses the plaintiff's request to file a sur-reply, dkt. no. 63-1, and his motion to file a supplemental brief, dkt. no 64. In the plaintiff's request to file a sur-reply (which he calls his supplemental brief in opposition to defendants' motion for summary judgment), the plaintiff states that he mistakenly omitted from his response brief his argument related to qualified immunity and that he would like to respond to the defendants' accusations that he manufactured disputes because his summary judgment filings were more detailed than his deposition testimony. Dkt. No. 63-1. The defendants contend that the court should strike or disregard the plaintiff's proposed sur-reply. Dkt. No. 65.

The court will deny the plaintiff's request to file a sur-reply because the court's local rules do not provide for sur-replies. Nor does the plaintiff state that the defendants proposed new material facts or evidence in their reply brief that would warrant a sur-reply. <u>See</u> <u>Slaughter v. Lutsey</u>, Case No. 17-C-1448, 2019 WL 11502919, at *1 (E.D. Wis. June 14, 2019), <u>aff'd</u>, 805 F. App'x 424 (7th Cir. 2020) (citations omitted).

In his motion to supplement the record under Federal Rule of Civil Procedure 56(e), the plaintiff asks to file exhibits in support of his proposed findings of fact 9, 17, 18, 19, 20, 22, 24 and 26. Dkt. No. 64 at 2. The plaintiff states that he thought it was acceptable to include in his declaration facts derived from discovery documents in lieu of submitting voluminous documents in support of his proposed findings of fact, because the information came from the defendants and was irrefutable. Id. at 1. The defendants oppose the plaintiff's motion. Dkt. No. 65.

Previously, the court denied the plaintiff's fifth motion for an extension of time to respond to the defendants' motion for summary judgment. Dkt. No. 54. At this point, it would be unfair to the defendants to allow the plaintiff to supplement the record with the exhibits. In any event, the plaintiff's exhibits mostly relate to his contention that the defendants erroneously told him that the RHU was full as an explanation for not moving him from cell 307. The plaintiff says that his exhibits show that the RHU was not full when the defendants told him it was. As explained below, whether the RHU was full is not material to the issue of whether the defendants violated the plaintiff's constitutional rights. The court will deny the plaintiff's request to supplement the record. See Fed. R. Civ. P. 56(e).

C.    Discussion

The defendants contend that they are entitled to summary judgment because the plaintiff cannot establish that the conditions of his cell violated contemporary standards of decency or that prison staff were aware of, or

14

disregarded, an excessive risk to the plaintiff's health or safety. Dkt. No. 26 at 5-6. They also contend that they are entitled to qualified immunity. Id. at 6. The plaintiff responds that the defendants were deliberately indifferent to conditions of confinement that failed to meet contemporary requirements of minimal decency. Dkt. No. 55 at 3. The defendants reply that even if the plaintiff had complained to the defendants that his cell was stuffy and unclean, no reasonable jury could find that the cell temperature and stains denied the plaintiff the "minimal civilized measures of life's necessities." Dkt. No. 60 at 1.

Although "the Constitution does not mandate comfortable prisons," it does mandate humane ones. Thomas v. Blackard, 2 F.4th 716, 719–20 (7th Cir. 2021) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)); see Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment, which prohibits cruel and unusual punishment, imposes duties on prison officials to "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." Thomas, 2 F.4th at 719-20 (quoting Farmer, 511 U.S. at 832). An official who does not uphold these duties violates the Eighth Amendment upon exhibiting "deliberate indifference to a substantial risk of serious harm to an inmate." Id. (quoting Farmer, 511 U.S. at 828).

An incarcerated individual challenging conditions of confinement must first show that the conditions were sufficiently serious as an objective matter, meaning "that they den[ied] the inmate 'the minimal civilized measure of life's necessities,' creating an excessive risk to the inmate's health and safety." Id. (quoting Isby v. Brown, 856 F.3d 508, 521 (7th Cir. 2017) (internal citation

omitted)). Second, under the subjective component of the inquiry, the incarcerated individual must prove that prison officials acted with deliberate indifference—that they knew of and disregarded this excessive risk of harm to the individual. Id. (citing Farmer, 511 U.S. at 834; Williams v. Shah, 927 F.3d 476, 480 (7th Cir. 2019)).

The plaintiff states that cell 307 was extremely hot, that the ventilation did not work and that there was feces and/or blood on the cell wall. Regarding the cell temperature, the plaintiff states that cell 307 was known as the "hot box" and that the cell window faced west and had a metal gutter on the outside that reflected sunlight into the cell. But it is undisputed that the defendants did not know of cell 307's designation as the "hot box," or that the cell of *every* window in the RHU has an exterior metal piece around it, or that cell 307's window faces southwest, not west. The temperature data the plaintiff submitted for July 2018 shows that the daytime high temperature reached almost 90 degrees for two of the twenty days the plaintiff was confined in cell 307. Other days, the high temperature ranged from the low 70s to the middle 80s. Dkt. No. 55-1 at 3-4. The low temperatures during that time ranged from about 50 degrees to about 70 degrees. Id. The plaintiff's cell contained a fresh air vent and an exhaust vent. The plaintiff states that the ventilation system was not working, and that this made the temperature warmer due to lack of air flow.

The plaintiff's evidence, viewed in the light most favorable to him as required on summary judgment, is insufficient for a reasonable factfinder to

16

conclude that cell temperatures reached inhumane levels. At most, the plaintiff's complaints support a finding of discomfort not unlike summer days without air conditioning in most parts of the country, which does not constitute cruel and unusual punishment. See Locke v. Schmidt, Case No. 18-C-443, 2020 WL 1158489, at *4 (E.D. Wis. Mar. 10, 2020). Compare Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir. 1997) (finding a conditions of confinement claim where cell temperatures averaged 40 degrees and ice regularly formed on cell walls during winter), Henderson v. DeRobertis, 940 F.2d 1055, 1057 (7th Cir. 1991) (reversing a finding of qualified immunity for prison officials where cell temperatures fell below freezing during a four-day cold spell where the outdoor wind chill was recorded at 80 degrees below freezing, the cellblock's heating system malfunctioned and broken windows allowed cold air inside), and White v. Monohan, 326 F. App'x 385, 387 (7th Cir. 2009) (cell temperatures measuring 110 to 130 degrees during the summer months stated a due process claim), with Rogers v. Scott, 695 F. App'x 155, 159 (7th Cir. 2017) (cell temperatures measuring in the middle 70s and low 80s and peaking at 85 degrees while the air conditioning was being repaired over several weeks did not violate the Fourteenth Amendment).

Regarding the cleanliness of cell 307, it is undisputed that the cell was cleaned the day before the plaintiff was transferred into the cell. Cell 307, like all RHU cells, had running water and a toilet. The plaintiff states that after some time in the RHU, "with no property or radio to offer distraction," he was "able to identify several spots on the wall which appeared to contain blood and

17

feces that either was not removed by the swampers [i.e., janitors] or had seeped out onto the surface." Dkt. No. 27 at ¶47. The plaintiff describes feces and/or blood "stains" that were "activated" by the heat or that seeped out from that cell walls. Dkt. No. 57 at ¶15.

Although the plaintiff alleges that he complained to defendants Koeller, Weycker, Friedel, Poetter and Wickman about the condition of his cell and/or wanting to be moved to another cell, he does not state that he asked the defendants for cleaning supplies. Cleaning supplies were distributed in the RHU's 300 wing on July 17 and 24, 2018. The plaintiff does not say whether he accepted any cleaning supplies when they were distributed. It is undisputed that the plaintiff asked an unidentified staff member for cleaning supplies for his cell "at some point toward the end" of the twenty days he spent in RHU, meaning during "the final probably seven to 10 days that [he] was there." Id. at ¶48. The plaintiff believed that the cleaning supplies that would have been provided on request—a spray bottle and towels—would have been insufficient to clean the walls because they would have smeared the filth around. Id. at ¶49. It is undisputed that if the plaintiff thought a pressure washer was needed to clean his cell, he could have asked for one to be used in his cell and he did not do so. The plaintiff believes that he should not have been moved into cell 307 because it is a "hard cell" intended for individuals who had more disciplinary issues that he did. He also says that he was falsely told that the RHU was full and that he would be moved when other cells became available.

Prison officials, must "provide inmates with 'reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities.'" <u>Hardeman v. Curran</u>, 933 F.3d 816, 820 (7th Cir. 2019) (quoting <u>Gray v. Hardy</u>, 826 F.3d 1000, 1005 (7th Cir. 2016)). The plaintiff has not raised a genuine factual dispute about whether, objectively, the conditions of his cell were sufficiently serious to deny him the minimal civilized measure of life's necessities. The conditions at issue in cases finding Eighth Amendment violations based on the presence of human waste were much more severe than those at issue here. <u>Compare</u> <u>Taylor v. Riojas</u>, 592 U.S. 7, 8-9 (2020) (incarcerated individual confined for four days in a cell covered floor to ceiling with feces, followed by two days in a frigid cell with a clogged drain overflowing with bodily waste, forcing the individual to sleep naked on the floor in raw sewage); <u>Thomas</u>, 2 F. 4th at 720-21 (individual confined in cell smeared with feces-covered walls, a lack of hot water, hundreds of dead flies in his bed, and a mattress covered in human waste); <u>Vinning-El v. Long</u>, 482 F.3d 923, 924 (7th Cir. 2007) (incarcerated individual held in cell smeared with feces and blood, with no working sink or toilet and no mattress); <u>Jackson v. Duckworth</u>, 955 F.2d 21, 22 (7th Cir. 1992) (incarcerated individual held in cell that allegedly was filthy and smelled of human waste, lacked adequate heating, contained dirty bedding, and had "rusted out" toilets, no toilet paper, and black worms in the drinking water); <u>Johnson v. Pelker</u>, 891 F.2d 136, 139-40 (7th Cir. 1989) (incarcerated individual held for three days in segregation cell allegedly smeared with human feces and having no running water while prison officials

19

ignored his requests for cleaning supplies and for the water to be turned on), with Jones v. Anderson, 116 F.4th 669, 679 (7th Cir. 2024) (cell with "dust bunnies" on the floor, a layer of "film" on the toilet seat and sink, and a stained mattress did not amount to a deprivation of the minimal civilized measure of life's necessities as an objective matter).

A reasonable factfinder could not conclude that the plaintiff was subjected to unconstitutional conditions confinement during the twenty days he spent in cell 307. The plaintiff claims that Koeller, Weycker, Friedel, Wickman and Poetter falsely told him he had to stay in the cell because the RHU was full. According to the plaintiff, the RHU was not full, and he could have been moved to a different cell at any time. But those assertions are not relevant to the plaintiff's Eighth Amendment claim. The plaintiff did not want to be in cell 307 and he asked to be moved multiple times. The parties dispute whether the plaintiff complained about the conditions of the cell to the defendants. This dispute is immaterial because even if the plaintiff did complain about the stains on his cell wall and the heat, the conditions of the cell did not amount to a sufficiently serious deprivation under the Eighth Amendment so no defendant acted with deliberate indifference by failing to move him. By the plaintiff's own account, it took him time to even notice the alleged stains; there is no evidence that he asked for supplies to clean them or that he asked for a power washer. Because the conditions of the cell do not implicate the Eighth Amendment's objective standards, the plaintiff cannot

establish that any defendant violated the Eighth Amendment by failing to move him from the cell.

A reasonable factfinder could not conclude that the defendants violated the plaintiff's constitutional rights. The court will grant the defendants' motion for summary judgment and dismiss this case.

## III.  Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 25.

The court **DENIES** the plaintiff's request to file sur-reply. Dkt. No. 63-1.

The court **DENIES** the plaintiff's motion to supplement the record. Dkt. No. 64.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court.* See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed

a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 13th day of February, 2025.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**